# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BUHLER VERSATILE INC.,** | : | Civil No. 1:17-CV-00217 |
| **Plaintiff** | : | (Magistrate Judge Carlson) |
| v. | : | |
| **GVM, INC.,** | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

I. **INTRODUCTION**

This case presents a commercial dispute between two businesses involved in the manufacture and sale of agricultural equipment. The case is scheduled for a non-jury trial before the undersigned on January 7, 2019, with a pretrial conference with the parties scheduled for December 7, 2018 at 3:00 p.m.

Now pending before the Court is a motion in limine filed by the defendant, GVM, Inc. ("GVM"). Unlike a typical motion in limine, GVM's motion does not seek to preclude the plaintiff, Buhler Versatile, Inc. ("Buhler"), from introducing any specifically identified evidence. Instead, GVM argues at length regarding the law that purportedly governs this commercial dispute – namely, the Convention on the International Sale of Goods ("CISG") – and argues that Buhler should be strictly limited to presenting evidence or testimony that GVM contends is relevant

to the claims and defenses in this case.  In essence, GVM seeks to narrowly define issues regarding the application of the CISG and the evidence that Buhler may rely on to prove its claims, and foreshadows the specter of sanctions litigation to the extent Buhler attempts to introduce evidence that was not previously produced in discovery.

Because the Court finds that GVM's motion seeks no specifically identifiable or workable form of relief of the type typically available on a motion in limine, and because the Court is well positioned to consider and evaluate the admissibility of evidence at time of the bench trial, the motion in limine will be denied with0out prejudice to the renewal of any arguments regarding the admissibility of evidence at trial.

## II. STATEMENT OF THE CASE

Buhler is a Canadian corporation located in Winnipeg, Manitoba, Canada, which manufactures agricultural equipment.  (Doc. 1, Compl., at ¶¶ 1-2.)  GVM is a Pennsylvania corporation located in East Berlin, Pennsylvania, and is also a manufacturer and seller of large agricultural equipment.  (Id. ¶¶3-4.)  In August of 2012, the parties entered into a purchase agreement pursuant to which Buhler agreed to produce 24 custom-made cabs to GVM for use in the manufacture of commercial sprayers.  The purchase order is identified as Order M6427.

The agreement provided that Buhler would furnish the cabs to GVM in three separate shipments. Under the original terms of the purchase order, GVM was to accept delivery of 8 cabs on each of three dates: January 5, 2013; February 5, 2013; and March 22, 2013. (Doc 35, Ex. A.)

GVM subsequently revised the shipment schedule several times. In the third revision, which GVM provided to Buhler on or about May 2, 2013, GVM scheduled the delivery dates for February 18, 2013, May 29, 2013, and September 13, 2013. (Doc. 35, Ex. E, "Revision 3".) By the time GVM tendered Revision 3, GVM had already delivered the first 8 cabs to Buhler.

On June 20, 2013, Buhler sent correspondence to GVM indicating acceptance of the revisions to the schedule. (Doc. 35, Ex. F.) On the same day, Brandy Carlson of GVM sent correspondence to Chris Bennie at Buhler indicating that the purchaser was seeking still a fourth revision to the agreement, this time stating, "I actually need to cancel 6 off this PO and only have 2 delivered in December. I know the freight is going to be really expensive, but we already cancelled our axles. Please see the revised PO. Thank you." (Doc. 35, Ex. G.) Along with this correspondence, GVM provided a proposed change to Revision 3, delaying the delivery of the last shipment of cabs to November 16, 2013, and proposing cancellation of the six cabs that GVM said it no longer needed. (Id.)

According to Buhler, by the time it received this final proposed revision to the purchase order, it had already manufactured each of the remaining eight cabs to meet GVM's specifications, and therefore maintains that it did not accept GVM's cancellation and suspended its performance due to GVM's statement that it did not intend to accept delivery of the final six cabs. Buhler represents that it delivered no cabs on September 13, 2013, which was the date final delivery was to be made pursuant to Revision 3. In addition, Buhler delivered no cabs in November 2013. Instead, for reasons that are not clear from the parties' motion papers, in December 2013, Buhler delivered two additional cabs to GVM. According to GVM, although it did not need these cabs by this point, the company built two additional Prowler Sprayers in order to use them.

According to GVM, although Buhler had not responded to GVM's further revisions to the purchase order, representatives of Buhler were discussing the matter internally. Thus, Chris Bennie at Buhler sent an internal email stating, "Just a heads-up. It seems that GVM would now like to reduce the qty of their current order of cabs to 2 (from 8). As well, they would like to push the delivery date back to December, rather than September. If this is going to cause problems for anyone, please let me know! I'm sure that Logistics has no problem with this one!!!" (Doc. 35, Ex. H.) GVM has represented that Buhler produced no additional internal correspondence to show that anyone responded to Bennie's email.

4

On December 18, 2013, Brandy Carlson at GVM emailed Chris Bennie at Buhler further inquiring into the matter, stating, "I'm showing that we still have 2 cabs on this PO that had a delivery date of mid-November. We do not need these cabs at all, Can you confirm that y'all do not show them open? And if you do, we need to cancel them. Please advise ASAP. Thanks." (Doc. 35, Ex. I.) Before receiving a response, Ms. Carlson emailed Chris Bennie again, this time indicating that she understood that the cabs were "being delivered today. I got a call from our shipping coordinator who said he received a call from a truck driver with cabs. I now need to know what to do to get them returned. Do you have another customer who uses these?" (Id.) Bennie replied, "No we don't. In fact we're still not sure what to do with the 6 remaining cabs from the original order. Are you still intending on using this cab? Please advise." (Id.)

Ms. Carlson responded, and referenced her prior correspondence: "No . . . as stated in the past, this is an end of life product for us. The whole reason we stopped making this machine was because Buhler was no longer going to make the cab readily available. Based on the past production schedules, I had gone over them numerous times, I thought we were going to still need those two. Apparently, there were changes made in the schedule that I missed and I should have cancelled the other two. I need to know if we can return them." (Id.) Chris Bennie

5

forwarded this email internally at Buhler asking for guidance about how to proceed, but it is unclear what if anything Buhler decided to do at this time.

On June 4, 2014, Chris Bennie emailed GVM and stated, "Please be advised that there are currently 6 pc remaining of part # 86537735 from your PO M6427, taking up a considerable amount of space in our plant, that we are very eager to send. Please advise the date that you will be ready to receive these 6 pc to close off your PO." (Doc. 35, Ex. J.)

GVM responded on June 24, 2014, noting that Buhler had never responded to earlier correspondence indicating that GVM no longer needed the cabs: "I emailed Chris and you back in December (see attached) that we were not going to use these cabs. I was never told we were required to take them. As you can see from the attached email, we didn't even want the last two that were shipped to us. There was never a reply to the attached email that I am aware of." (Doc. 35, Ex. K.)

The transaction became further confusing as the summer progressed, as on July 21, 2014, Brandy Carlson emailed Buhler to say, "It seems that the lack of communication is going to work out for our customer since we now need to order one, however we are not going to take possession of the other 5 that are at your facility." (Doc. 35, Ex. L.) According to GVM, Buhler never responded to this latest request, and did not further address the issue regarding the six remaining

6

cabs off of the original purchase order until December 2, 2014, when Buhler Vice President Maxim Loktionov contacted Brandy Carlson to advise her that there was still an outstanding issue with the remaining six cabs. Specifically, Loktionov represented that "BVI never acknowledged the order cancellation from GVM and build cabs according to year [sic] demand. Therefore you have to take them or we can dispose them after your payment." (Doc. 35, Ex. M.)

GVM's President, Mark Anderson, responded by email the next day, noting that "We completed our last production in April of 2014. Maybe some day we could use them as replacement cabs. Up until this time consider this a closed deal." (Doc. 35, Ex. N.) Loktionov responded in part by indicating that Buhler had never acknowledged the order cancellation, since the six cabs had already been built. (Id.)

Buhler initiated this lawsuit by filing a complaint on February 6, 2017, alleging claims for breach of contract, and seeking approximately $80,000 in damages plus additional costs incurred by GVM's alleged breach. (Doc. 1.)

Buhler's position in this litigation seems to be that GVM breached its obligations under the purchase agreement and owes damages for the six cabs that Buhler manufactured but never shipped. Buhler further argues it had no obligation to respond to GVM's attempts to further modify the purchase order in June 2013 because the company had already built all of the cabs that GVM originally ordered.

GVM defends against Buhler's claims by arguing first that Buhler accepted the final proposed revision to the purchase order by shipping only two of the remaining six cabs; and, second, that Buhler breached the terms of the parties' agreement and is barred from recovering against GVM because Buhler did not deliver the remaining eight cabs by September 13, 2013, as provided for in Revision 3 to the purchase agreement. GVM maintains that it is not liable for breaching the purchase agreement.

## III. DISCUSSION

In its motion in limine, GVM does not identify any specific evidence or testimony that it believes should be excluded in advance of the bench trial. Instead, GVM has filed a motion in limine seeking entry of an order that would limit Buhler to "presenting evidence that would allegedly excuse its failure to deliver the cabs by September 13, 2013" or that is otherwise "relevant under the CISG." (Doc. 35, at 20-21.) GVM further argues that Buhler should be required to make an offer of proof as to any evidence that it intends to rely on at trial, and suggests that if Buhler does not have any evidence that GVM considers to be relevant to the claims and defenses in this case, that GVM should be spared the expense and inconvenience of trial.

Upon consideration of the parties' briefs, we agree with Buhler that GVM's motion is not so much a motion in limine as it is an untimely motion for summary

judgment. Moreover, we do not find good grounds to enter an in limine ruling that would straitjacket the parties' presentation of their case at a bench trial, where concern over juror confusion is obviated, and where the undersigned will be in a better position to address and resolve any disputes that the parties may have at that time with the benefit of factual context.

The Court is vested with broad inherent authority to manage its cases, which carries with it the discretion and authority to rule on motions in limine prior to trial. See Luce v. United States, 469 U.S. 38, 41 n.4 (1984); In re Japanese Elec. Prods. Antitrust Litig., 723 F.2d 238, 260 (3d Cir. 1983), rev'd on other grounds sub nom., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) (the court exercises its discretion to rule in limine on evidentiary issues "in appropriate cases"). Courts may exercise this discretion in order to ensure that factfinders are not exposed to unfairly prejudicial, confusing or irrelevant evidence. United States v. Romano, 849 F.2d 812, 815 (3d Cir. 1988). Courts may also do so in order to "narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1069 (3d Cir. 1990) (citation omitted). However, courts should be careful before doing so.

In considering motions in limine which call upon the Court to engage in preliminary evidentiary rulings under Rule 403 of the Federal Rules of Evidence,

we begin by recognizing that these "evidentiary rulings [on motions in limine] are subject to the trial judge's discretion and are therefore reviewed only for abuse of discretion ... Additionally, application of the balancing test under Federal Rule of Evidence 403 will not be disturbed unless it is 'arbitrary and irrational.' " Abrams v. Lightolier Inc., 50 F.3d 1204, 1213 (3d Cir.1995) (citations omitted); see Bernardsville Bd. of Educ. v. J.H., 42 F.3d 149, 161 (3d Cir.1994) (reviewing in limine rulings for abuse of discretion). Yet, while these decisions regarding the exclusion of evidence rest in the sound discretion of the district court and will not be disturbed absent an abuse of that discretion, the exercise of that discretion is guided by certain basic principles.

One of the key guiding principles is reflected in the philosophy which shapes the rules of evidence. The Federal Rules of Evidence can aptly be characterized as evidentiary rules of inclusion, which are designed to broadly permit factfinders to consider pertinent factual information while searching for the truth. The inclusionary quality of the rules, and their permissive attitude towards the admission of evidence, is embodied in three cardinal concepts. The first of these concepts is Rule 401's definition of relevant evidence. Rule 401 defines what is relevant in an expansive fashion, stating:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more

10

probable *197 or less probable than it would be without the evidence.

Fed. R. Evid. 401.

Adopting this broad view of relevance it has been held that: "Under [Rule] 401, evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' [Therefore] 'It follows that evidence is irrelevant only when it has no tendency to prove the fact. Thus the rule, while giving judges great freedom to admit evidence, diminishes substantially their authority to exclude evidence as irrelevant.' " Frank v. County of Hudson, 924 F. Supp. 620, 626 (D.N.J.1996) citing Spain v. Gallegos, 26 F.3d 439, 452 (3d Cir.1994) (quotations omitted).

This quality of inclusion embraced by the Federal Rules of Evidence, favoring the admission of potentially probative proof in all of its forms, is further buttressed by Rule 402, which generally defines the admissibility of relevant evidence in sweeping terms, providing that:

> All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

Fed. R. Evid. 402.

Thus, Rule 402 expressly provides that all "[r]elevant evidence will be admissible unless the rules of evidence provide to the contrary." United States v. Sriyuth, 98 F.3d 739, 745 (3d Cir.1996) (citations omitted). While these principles favoring inclusion of evidence are subject to some reasonable limitations, even those limitations are cast in terms that clearly favor admission of relevant evidence over preclusion of proof in federal proceedings. Thus, Rule 403, which provides grounds for exclusion of some evidence, describes these grounds for exclusion as an exception to the general rule favoring admission of relevant evidence, stating that:

> Although relevant, evidence may be excluded if its probative value **is substantially outweighed** by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403 (emphasis added).

By permitting the exclusion of relevant evidence only when its probative value is "substantially outweighed" by other prejudicial factors, Rule 403 underscores the principle that, while evidentiary rulings rest in the sound discretion of the court, that discretion should consistently be exercised in a fashion which resolves all doubts in favor of the admission of relevant proof in a proceeding,

unless the relevance of that proof is substantially outweighed by some other factors which caution against admission.

Furthermore, as noted, the limited purpose of a motion in limine "is to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." Buddy's Plant Plus Corp. v. Centimark Corp., 978 F. Supp. 2d 523, 528 (W.D. Pa. 2013). Given their narrow function, "motions in limine should not be used to resolve factual disputes, which remains the function of summary judgment, with its accompanying procedural safeguards." Graves v. District of Columbia, 850 F. Supp. 2d 6, 11 (D.D.C. 2011). Accordingly, "[a]s a general rule, if the moving party is seeking a ruling that goes beyond an evidentiary determination, there is a strong likelihood that the motion in limine deals with an inappropriate matter." Mavrinac v. Emergency Medicine Ass'n of Pittsburgh, 2007 WL 2908007, at *1 (W.D. Pa. Oct. 2, 2007). In such cases, courts caution that motions in limine are "inappropriate vehicles to seek a final determination with respect to a substantive cause of action, and should not be used for a motion for summary judgment." Id.

Guided by these legal considerations, we find that GVM's motion in limine should be denied. We note initially that GVM's motion in limine does not seek the exclusion of any specific testimony or evidence. Instead, GVM seeks entry of an order that would strictly limit Buhler's presentation of unidentified evidence based

upon GVM's own construction of the CISG, and its own recitation of the facts in this case. In essence, GVM would have the Court rule on a motion in limine in a way that would adopt GVM's interpretation of the CISG, and resolve factual disputes in GVM's favor advance of trial, based upon evidence that Buhler represents is the subject of sharp disagreement between the parties. A motion in limine is not the appropriate procedural vehicle to obtain such broad relief in advance of trial, particularly where GVM has not identified any specific evidence to be excluded, and where GVM is asking the Court to make legal rulings and factual determinations without any of the procedural protections that would ordinarily govern a motion for summary judgment.

Furthermore, although the Court appreciates GVM's concerns about the presentation of evidence that may run counter to its own interpretation of the CISG or the evidence developed in this case, this case is proceeding to a bench trial. As such, any concern about juror confusion is obviated, and the Court is well-positioned to make judgments regarding the admissibility of evidence within the context of the trial itself. Indeed, although courts will rule on motions in limine in advance of bench trials in appropriate cases, <u>Velez v. Reading Health System</u>, 2016 WL 9776079 (E.D. Pa. Feb. 24, 2016), they often will find it unnecessary to do so because the concerns over prejudice or confusion to a jury are absent. <u>See</u> 9 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure Civil 3d §

2411 (3d ed. 2008; see also United States v. Brown, 2017 WL 219521 (N.D. Ill. Jan. 19, 2017) (noting that concerns over the potential for prejudice from improper evidence "are minimal in bench trials . . . rulings on motions in limine are less important."); Alan L. Frank Law Assocs., P.C. v. OOO RM Invest, 2016 WL 9348064 (S.D. Fla. Nov. 30, 2016).

Although in limine rulings before bench trials may be appropriate in certain cases, this is not one of them. GVM has not sought the exclusion of any specifically identified evidence. Instead, GVM invites the Court to embrace its own interpretation of the CISG, and its own view of the facts that may be relevant to the claims and defenses in this case, all of which are sharply contested by the parties. The Court finds it would be inappropriate to prematurely make what could amount to a dispositive ruling in GVM's favor on a motion in limine, and accordingly will defer rulings on the admission of particular evidence in this case until the time of trial, when its relevance or potential for prejudice may be better assessed.

## IV. ORDER

Accordingly, IT IS HEREBY ORDERED THAT GVM's motion in limine (Doc. 34) is DENIED without prejudice to renewal and resolution of these evidentiary issues at trial.

So Ordered this 20th day of November, 2018.

> */s/ Martin C. Carlson*
> Martin C. Carlson
> United States Magistrate Judge